Good morning, Your Honors. May it please the Court, my name is Douglas Nelson on behalf of the Petitioner. Now, the immigration judge decided that my client does not qualify for asylum and that he is not deserving of discretion. Those are the two questions in this case. This Court reviews for substantial evidence. Now, it's interesting to note that corroborative evidence is not required in the asylum context. A person can come forward and testify in a credible manner and establish that they are eligible for asylum. In this case, the respondent not only testified credibly and the judge found that his testimony was credible, but he also submitted 14 documents as evidence that homosexuals are persecuted in Lebanon. In addition to that, he submitted another 19 documents that proves that under Islamic law, homosexuals are persecuted. Nevertheless, the immigration judge decided that the applicant had not provided direct and specific facts that make, that would make him fear return to Lebanon. That holding is simply unsupportable. Well, assuming that that's all true, he still has to show that he himself has been persecuted or has a reasonable fear of future persecution, right? That's correct. I mean, our laws don't say anybody who's a homosexual in a country that doesn't recognize or which discriminates against homosexuals is entitled to asylum. That's correct. We don't open our doors to everybody who claims one of the five grounds of eligibility for asylum. They have to establish that they have suffered past persecution or a well-founded fear of future persecution. And isn't that basically what the I.J. said? I've listened to everything that your client has said, but I just don't think that's persecution within the meaning of the statute as to him? Well, I'll address the nexus in just a moment, but the immigration judge did go further than that. He stated that there was no evidence that the criminal law in Lebanon did not or permits homosexuality. And that is also rebutted by substantial evidence which we have provided. But regarding whether he has a well-founded fear of persecution or he suffered past persecution, first, he did suffer past persecution in that he was threatened, his cousin was threatened and killed, his cousin was shot in the anus and later killed during a period of moral purification. And that is res ipsa loca dora. I mean, obviously, the judge didn't find a nexus there. He said that the applicant had failed to see that Ramzi Khalil was shot in the anus was for being a homosexual. And that's clearly not supported by the evidence. But a client can also qualify not just based upon past persecution, but based upon a well-founded fear of future persecution. Since the response or since Mr. Crooney has been living in the United States, he has been outed to people in Lebanon, people who have persecuted his homosexual friends and have threatened him in the past. So on that finding alone, we can show that he has a well-founded fear of future persecution. When did he claim asylum on that basis? How long after he'd been here? 1997, Your Honor, is when he filed his application. I'm sorry, 1998. And in 1997, the Congress implemented a new law that said you have to file for asylum within one year of entry. And they gave you a one-year period in order to do so. And he filed before that deadline, before there was no statutory requirement that he file. When he made those two trips back to Lebanon, had he claimed asylum yet? No, Your Honor. But he was fearful during both of those trips. He was compelled to return because his father was ill, and his father later died, and he didn't attend the funeral for fear of persecution. Later, his mother passed away, and he couldn't bear it any longer, and he went to her funeral. But during both occasions, he remained indoors, and he did not go out normally in public as a normal person might, engaging a lot of people or communicating with a lot of people. He was fearful that he might be discovered for being homosexual and later persecuted, just as his friends were, just as his family members were. Now, the likelihood that he would be discovered to be homosexual in the future is very high, given his illness. He is dependent upon life-saving drugs, which he receives here in the United States, and paid for by himself, by the way, that may not be available in his country. And if available in his country, he has to go and attain them. And his illness may be discovered to other persons in his country, therefore increasing the likelihood of persecution. Now, remember that in asylum, the standard or the burden of proof in asylum is less than that for withholding, which is more likely than not. He merely has to show that he has a well-founded fear of return, and he has that because the documents show persons in the same circumstances are persecuted, harmed, detained, beaten, and sometimes executed. And documents also show, and his testimony shows, that it is likely he would be discovered if returned to his country. Now, regarding discretion, the judge also denied for discretion because Mr. Karouni had two crimes in the United States, one related to an accident with a motorcycle, and he fled the scene for fear of the police. He completed all the terms of that conviction, of his probation. He did not do any jail time for that. In the second instance, he was accused and convicted of destroying an expensive book in a library. Now, for those two reasons... The Los Angeles City Library. Yes, Your Honor. And yes, it was an expensive book. And yes, he should not have done it. Is there some evidence that he's kind of a scofflaw? No, Your Honor, I don't think so, because he was ordered to attend counseling for what he had done. And he even testified that the counseling was very helpful to him and that he has not repeated any of that behavior. And it's been now 10 years, I think, since he's engaged in that behavior. But the law says that unless that asylum should be granted unless there are severe or severe adverse factors in a case. Now, neither of these crimes are related to violence, physical violence, where he went out and attempted to harm another person. He... To look at the character of the person in making his discretionary decision as to whether to exercise discretion in favor of granting asylum? Yes, Your Honors. Under a matter of PULA, you look at a whole list of documents which we, or a list of factors which we cited in our brief. And among those can be the person's character. Nevertheless, when he presented his evidence, it had been, or when he presented his testimony, it had been many years since the convictions had occurred. And again, only the most egregious or most adverse factors warrant a denial of asylum. We're talking about returning an individual to his country where it is highly likely he'd be persecuted, beaten, arrested, detained, tortured, possibly executed if returned to that country. I'd like to reserve the remaining two minutes of my time for rebuttal. Thank you. May it please the Court. Again, my name is Luis Perez. I represent the Respondent. Your Honor, just to make a clarification in the record real quick, the immigration judge made a discretionary determination with respect to asylum. He made it with respect to the application for voluntary departure. And he did consider the convictions, the Petitioner had in order to deny voluntary departure. The only determination with respect to the asylum application was that the immigration judge found Mr. Coroni to be ineligible for asylum. Now, with respect to past persecution, the immigration judge considered that Mr. Coroni only testified that in 1984 he was questioned, presumably by a militiaman from Hezbollah, and that these people questioned him about his homosexuality and that they threatened him after, during the questioning. Nevertheless, that threat went unfulfilled. He lived in Lebanon for about two years without incident. In 1986, he testified that in 1996 he decided to go to the United States because his life was in danger. He did not explain why he said his life was in danger. He could have gone to the United States before, in 1984, because he had siblings who lived in the United States since 1982, one of which is a U.S. citizen who could have petitioned him. With respect to the Will Fond of Fear Petitioned him for what? File a visa petition for him. Because he has a United States citizen, it would have been easier for him to come to the United States with a visa since 1984. How long did it take, then, 20 years? I don't think 20 years is accurate, Your Honor. I don't know exactly how much visa applications take. I, for a fact, know that marriage applications take between 600 and 800 days. I don't know specifically how much it takes for this particular case for a citizen. But a marriage application is different. Yes. But a marriage application is, once you get the application, you qualify for adjustment of status, so it's to stay here permanently. But the point is that if he feared persecution in 1984, the reasonable thing would have been for him just to try to request a visa to leave the country immediately. But instead, he decided to stay two years in Lebanon. And where would he get the visa? He could have asked one in the embassy, at the consular section of the United States embassy in Lebanon, or his brother could have just petitioned for him. In fact, he came with a visa in 1986. The point is that a person who fears persecution in his country will try to leave his country immediately. That person would not wait two years to leave that country. And during these two years, nothing happened to him. As a matter of fact, when he came in 1992 and 1996, nothing happened to him. Both his trips resulted without incident. So based on his particular experiences, the immigration judge found that he did not establish past persecution or a well-founded fear of future persecution. And I think that the evidence of the record supports this conclusion, much less there is the evidence on the record does not compel the immigration judge to establish past persecution or has a well-founded fear of future persecution because Hezbollah or the Lebanese government is seeking to persecute him. Now, the other issue before the Court is whether there is a pattern of practice of persecution in Lebanon against homosexuals. And the immigration judge specifically considered all the evidence in the record. In fact, Your Honor, I will read from the immigration judge's decision. He specifically says there seems to be conflicting documentation concerning the current conditions in Lebanon as they relate to homosexuals. The Respondent seems to indicate that Islamic law prevails in Lebanon. As a matter of fact, there are key provided documents  in Shia-controlled areas of the Lebanon, and that is his contention in his opening briefing. So the immigration judge did consider that evidence. With regard to certain social aspects such as homosexuality, there has been evidence to show that individuals in Lebanon are prosecuted for homosexual conduct. So the immigration judge acknowledged that there are anti-sodomy laws in Lebanon, that it is illegal to not to be an homosexual, but to engage in homosexual conduct. And there has been no evidence that mere homosexuality is against the law in Lebanon. Your Honor, the Court has to review the record and determine whether the documents Mr. Coruñi presented compel the conclusion that there is a pattern of practice of persecution in Lebanon  against being an homosexual. And the government of Lebanon, true, they arrest people because they have engaged in homosexual acts. But nothing in the record states that generally the government of Lebanon arrests people for merely being homosexual. There might have been instances where that may have happened. But that is not the the this that is not the standard of review. Furthermore, with respect to Hezbollah, it is clear from the administrative from the documents in the administrative record that Hezbollah does control certain areas of Lebanon. But there are other areas in Lebanon that are not controlled by Hezbollah. They are controlled by the Lebanese government. And in this Yes. What areas are those? Well, according to the State Department report, there are some areas in the south that are controlled by Hezbollah, some suburbs in the south of Peru that are controlled by Hezbollah. But the rest of the country is either controlled by the Lebanese government, by the Israeli government, or by Syria. So there are some portions. Israeli government is out of there. Yes. The southern portion of Lebanon, there are certain portions of Lebanon that have that share a common boundary with Israel, are controlled by the were controlled by the Israeli government. And I think the Israeli government left recently. A long time ago. Yeah. Well, after he did. Yeah. But there are still some influence of Israel in those areas with respect to their security and the actions of Hezbollah. They still oversee certain areas. They don't control them. But the point is, Your Honor, that there are portions of Syria, Syria doesn't control Lebanon. Syria has, there are certain portions where Syria has influence in Lebanon. Well, they have their soldiers there, hasn't they? They have 30,000 soldiers in Lebanon. But with respect to this case where Mr. Karouni is claiming persecution on account of his homosexuality, there are portions in Lebanon where he can live, where Sharia law does not apply. Lebanon is not an Islamic state. It is controlled by both Christians and Muslims. And Mr. Karouni lived in a Hezbollah-controlled area during his whole life, and nothing happened to him, except with the... I'm just curious, what part of Lebanon is controlled by Christians? Well, the government of Lebanon, the president of Lebanon is a Maronite Christian, so they share the government. The prime minister is Muslim, and that is how it is constituted in their laws. So it's not an Islamic state. It's a secular state where Christians and Muslims share power, and it's clearly delineated in their laws how that power is shared. The point is that, and there are also documents in the record, and it is cited in Respondent's Brief. For example, the United Nations High Commission on Refugees specifically states that those homosexuals in wealthy families are tolerated in society, that if they keep their homosexuality private, they will not be harassed. So there is also conflicting evidence in the record as to what will be the result of making public homosexuality. So based on this record, Your Honor, many inferences can be drawn. But if he has AIDS, he has to go to a drugist, doesn't he? Where does he go to get his pills? Well, he claims that he will not be able to get drug medicines because they are not available in Lebanon, but that has nothing to do with his homosexuality. There is really no link between — he's not being — he's not claiming that he's been going to be persecuted on account of having AIDS. He's claiming that he's going to be persecuted on account of being a homosexual. He tries to make a link by saying that because AIDS is regarded as a disease of homosexuals, the medicines are not available. But there's nothing in the record to compel that conclusion. And remember, Your Honor, as I was saying, inferences can be drawn. But the gist of the issue is whether the record compels a conclusion contrary to that of the immigration judge's decision. If the Court has any questions. There are two ways to get — to obtain asylum, by showing past persecution and well-founded fear of future persecution. The immigration judge solely concentrated on past persecution. The decision is nearly devoid, almost completely devoid, of any analysis regarding a well-founded fear of future persecution. The immigration judge's decision — I keep saying respondent because in an immigration court they are respondents — but the applicant lived in the United States peacefully for quite a long time. And during that time, he learned that if he returned, he would be harmed because his friends were continually having problems, being arrested and detained and beaten on account of their homosexuality. That is the difference in this case. That is why he didn't apply when he first arrived, but that he learned after living here that persons in similar circumstances were being persecuted in this country, and that is when he applied for asylum. Now, there was made mention of a visa application. Visa applications in this circumstance through a relative would take 10 to 12 years. That is out of the realm of possibility when the petitioner had applied. Also, the judge and counsel stated that there is no evidence that being a homosexual is illegal. That is not required under the law. We do have proof that — a lot of proof showing that homosexuals who practice homosexuality are persecuted. And I think it would be a privilege to engage in the type of sex which he desires. I know that if a heterosexual were put in the same circumstances, it would be unbearable. It's not a reason for sending this gentleman back to his country. But — So you're saying that would constitute persecution? Well, no, but I mean by — That's kind of an interesting argument. I hadn't thought of that one before. But if you're going to practice sex in another country, something that is considered HADD, as it is considered in that country, it's more likely that it's going to be discovered by other persons. Heterosexual sex is not. It's common. It's normal. It's practiced by most persons in that region. But when you practice something that's considered HADD, it's more likely that it's going to be discovered or he's going to be outed for it. But it doesn't have to be illegal for him to suffer persecution. And I'm wrapping it up right now. Just as in the matter of Kasinga, where a woman — it's not illegal in certain African countries to be uncircumcised. Nevertheless, if you are uncircumcised in those countries, persons in that — in those cities and towns, in that society, will pin down a woman and circumcise them. They will persecute them for that. So it doesn't have to be illegal for him to qualify. Thank you very much. Okay. We'll take the last matter. And that's Elion versus Ashcroft.
judges: Goodwin, Pregerson, Tallman